E
X
H
I
B
I
T

E X H I B I T A

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| WILLIAM GERACZYNSKI and CHRISTINE GERACZYNSKI, | : : : | |
| Plaintiffs, | : : | CIVIL ACTION |
| v. | : : : | |
| | : | NO: 2:11-cv-06385-SRC-MAC |
| NATIONAL RAILROAD PASSENGER CORPORATION, SAFCO PRODUCTS COMPANY, LIBERTY DIVERSIFIED INTERANTION and STAPLES, INC. | : : : : | |
| | : | |
| Defendant. | : | |

### PLAINTIFFS' ANSWERS TO INTERROGATORIES SERVED BY DEFENDANT SAFCO PRODUCTS COMPANY

1.    William A. Geraczynski, 518 Prospect Place, Lyndhurst, NJ 07071-2639, August 2, 1950. Christine C. Geraczynski, 518 Prospect Place, Lyndhurst, NJ 07071-2639, November 21, 1957.

2.    On the morning of April 20, 2011, Mr. Geraczynski, along with other employees of Amtrak's mechanical, electrical and cleaning departments, assembled in the new trailer facilities for the daily morning safety briefing and work assignments.    Mr. Geraczynski was severely injured when the chair in which he was seated collapsed, broke and/or snapped and he was forcefully thrown to the ground.

3.    As a result of the injuries sustained on April 20, 2011, Mr. Geraczynski remains disabled from resuming his employment with Amtrak and continues to suffer a loss of mobility, physical discomfort and pain with daily activities, sleep disruption, irritability and depression. To date, Mr. Geraczynski has not been medically cleared by his treating physician to perform his former job with the railroad or light duty work.    See medical records appended to plaintiffs' responses to defendant's request for the production of documents as well as medical expert disclosures which will be produced within the time prescribed by the Court's Scheduling Order.

4.    Following his injury, Mr. Geraczynski was transported to the Emergency Room at Elmhust Hospital Center, 79-01 Broadway, Elmhurst, NY 11373. He underwent a series of treatments at Meadows Surgery Center, 75 Orient Way, Rutherford, NJ 07070, including



epidural steroid injections on July 18, 2011, August 8, 2011, and October 10, 2011 and right medial branch blocks on September 15, 2011. On March 6, 2012, Mr. Geraczynski was admitted to Hackensack University Medical Center, 20 Prospect Avenue, Hackensack, NJ 07601, where he underwent an anterior lumbar interbody fusion. He was discharged from the hospital on March 10, 2012. Any and all medical records currently in plaintiffs' possession and/or control are appended to plaintiffs' response to defendant's request for the production of documents.

5.    Mr. Geraczynski underwent a series of diagnostic testing including an April 28, 2011, CT scan of the lumber spine without contrast, June 14, 2011, motor and sensory nerve conduction studies, and a June 23, 2011, MRI of the lumbar spine. Any and all medical records currently in plaintiffs' possession and/or control are appended to plaintiffs' response to defendant's request for the production of documents.

6.    (a) William Albert, MD, 71 Union Avenue, Suite 201 Rutherford, NJ 07070; (b) Elmhust Hospital Center, 79-01 Broadway, Elmhurst, NY 11373; (c) Hackensack University Medical Center, 20 Prospect Avenue, Hackensack, NJ 07601; (d) Abe T. Haliczer, MD, Pain Management, 47 Orient Way, Suite LL-C, Rutherford, NJ 07070; (e) Hackensack Radiology Group, 30 South Newman Street, Hackensack, NJ 07601; (f) Meadows Surgery Center, 75 Orient Way, Rutherford, NJ 07070; (g) Bernard P. Newman, MD, Orthopedic Spine & Sports Medicine Center, 2 Forest Avenue Paramus, NJ 07652; (h) Newman Street Imaging Center, 30 South Newman Street, Hackensack, NJ 07601 (i) Patrick Roth, MD, North Jersey Brain and Spine Center, 680 Kinderkamack Road, Oradell, NJ 07649; (j) Peter Schmaus, MD, Orthopedic Spine & Sports Medicine Center, 2 Forest Avenue, Paramus, NJ 07652. Any and all medical records currently in plaintiffs' possession and/or control are appended to plaintiffs' response to defendant's request for the production of documents.

7.    Bernard P. Newman, MD, Orthopedic Spine & Sports Medicine Center, 2 Forest Avenue Paramus, NJ 07652.

8-9.   At the time of his accident, Mr. Geraczynski was employed as a car inspector by the National Railroad Passenger Corporation ("Amtrak"), at 29-39 Honeywell Street, Long Island City, NY 11101. Since this time, he has been and remains disabled from resuming his former employment with the railroad. Mr. Geraczynski's earnings are reflected in his 2006 through 2011 tax returns copies of which are appended to plaintiffs' responses to defendant's request for the production of documents.

10-1. Upon information and belief, all medical bills, with the

exception of prescription costs, have been paid by the carrier. Mr. Geraczynski has executed an authorization for the release of his CVS Pharmacy records.

12.    Objection. Defendant's interrogatory 12 is overly broad and seeks the disclosure of information protected from discovery by privilege or other doctrine. By way of further answer and without waiving said objection, see documents appended to plaintiffs' response to defendant's request for the production of documents.

13.    Eyewitnesses to the accident would include some or all of the Amtrak employees present at the April 20, 2011, Safety Meeting.   The names of all Amtrak employees attending that daily meeting would be included in the sign-up sheet for the day which is in the exclusive possession and/or control of defendant Amtrak. Of those present, Mr. Geraczynski recalls the following electricians: Gary Lipkowski, Sal Mazerko, Joe Murphy, Dave Psudereen, and Jose Torres.   He also remembers that the following mechanics were in attendence: Frank Bonogoro, Al Chin, Richard Conners, Emmanuel DaVines, Manny Lamisella, Jack Ng, Tony Ochs, Dean Psomiades, Roman Vilca, and Jimmy Williams.

14.    Other individuals of persons who may have knowledge of relevant facts include: Tom Ackerle, Angela Chromes, and General Foreman Scott, all Amtrak employees, as well as Mr. Geraczynski's medical providers and spouse.

15.    Objection.   Defendant's interrogatory 15 seeks the disclosure of information immunized from discovery by the work product doctrine. Without waiving said objection, see photographs reproduced in the Amtrak Injury Report/Recommendations appended to defendant's Rule 26(a)(1) Initial Disclosures as well as the photographs taken by plaintiffs' liability expert, George P. Widas, PE, CSP, during his February 13, 2011, inspection of the chair involved in plaintiff's accident.

16.    Objection. Defendant's interrogatory 16 is overly broad and seeks the disclosure of information protected from discovery by privilege or other doctrine. By way of further answer and without waiving said objection, none.

17.    Discovery is continuing; plaintiffs will produce all expert disclosures consistent with the Court's Scheduling Order.

18.    Objection. Defendant's interrogatory 18 is overly broad and seeks the disclosure of information beyond the scope allowable for impeachment under the Federal Rules of Evidence.   By way of further answer, and without waiving said objection, Mr. Geraczynski

has never been convicted of a felony or a crime involving a dishonest act or false statement.

19.    Plaintiffs are without sufficient knowledge to respond to this interrogatory at this time.  Upon information and belief, a quote which included purchase of the chair in question was prepared by Business Interiors on or about September 30, 2009. As discovery is continuing, plaintiffs reserve the right to supplement this response.

20.    See plaintiffs' response to defendant's interrogatory 15.

21-2. Discovery is continuing; plaintiffs will produce all expert disclosures consistent with the Court's Scheduling Order.

23.    Upon information and belief, General Foreman Scott Hinkson inspected the chair after the accident.  Documents produced by the defendant, including the Amtrak Investigation Report, indicate that Mr. Hinkson found the chair in question to be defective.   In addition, on February 13, 2012, plaintiffs' liability expert, Mr. George Widas, inspected the subject chair at Amtrak's New York Claims Department.

**BARISH ROSENTHAL**

BY:_____
    Samuel J. Rosenthal
    Attorney for Plaintiff

Dated:    June 1, 2012

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing Plaintiff's Answers to Defendant's, SAFCO, Interrogatories and Plaintiff's Responses to Defendant's, SAFCO, Request for Production of Documents, was served by United States First Class Mail, Postage Prepaid, upon:

Glenn A. Montgomery, Esquire
MONTGOMERY CHAPIN & FETTEN, P.C.
745 Route 202/206
Suite 101
Bridgewater, New Jersey 08807

Francis W. Worthington, Esquire
WORTHINGTON & WORTHINGTON
2370 York Road, A-2
Jamison, Pennsylvania 18929

Andrew Charkow, Esquire
LANDMAN, CORSI, BALLAINE & FORD
One Gateway Center, Fourth Floor
Newark, New Jersey 07102-5311

on this 7th day of June, 2012

**BARISH♦ROSENTHAL**

BY: _____
SAMUEL J. ROSENTHAL

E
X
H
I
B
I
T

E  X  H  I  B  I  T          B

MONTGOMERY, CHAPIN & FETTEN, P.C.
745 Route 202/206
Suite 101
Bridgewater, NJ 08807
(908) 203-8833
Attorneys for defendant, SAFCO Products Company,
a division of Liberty Diversified Industries, Staples, Inc.
and Corporate Express
    Our file No.  GP 19,843 USD-2

## UNITED STATES DISTRICT COURT
### for the
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| WILLIAM GERACZYNSKI )<br>518 Prospect Place )<br>Lynchurst, NJ 07071 )<br>)<br>and )<br>)<br>CHRISTINE GERACZYNSKI )<br>518 Prospect Place )<br>Lynchurst, NJ 07071 )<br>)<br>          Plaintiffs, )<br>vs. )<br>)<br>NATIONAL RAILROAD PASSENGER )<br>CORPORATION d/b/a AMTRAK )<br>30TH &Market Streets, 2nd Floor)<br>Philadelphia, PA 19104 )<br>)<br>and )<br>)<br>SAFCO PRODUCTS COMPANY )<br>9300 West Research Center Road)<br>New Hope, MN 55428 )<br>)<br>and )<br>)<br>)<br>LIBERTY DIVERSIFIED )<br>INTERNATIONAL )<br>5600 North Highway 169 )<br>New Hope, MN 55428-3096 ) | CIVIL ACTION - LAW<br><br>No. 2:11-cv-6385-SRC-MAC<br><br><br>AFFIDAVIT OF<br>PAM LAFONTAINE |

|  |  |
|---|---|
| and | ) |
|  | ) |
|  | ) |
| STAPLES, INC. | ) |
| 500 Staples Drive | ) |
| Framingham, MA 01702 | ) |
|  | ) |
| and | ) |
|  | ) |
| CORPORATE EXPRESS | ) |
| 1 Environmental Way | ) |
| Broomfield, CO 80021 | ) |
|  | ) |
| and | ) |
|  | ) |
| OASYSCHAIR CO., LTD. | ) |
| No. 88, Sec. 3, Baoda Road, | ) |
| Guiren Shiang Tainan County | ) |
| 71145, Taiwan | ) |

Defendants

---

I, PAM LAFONTAINE, of full age, upon my oath, depose and say:

1. I am the Director of Global Sourcing at SAFCO Products Company ("SAFCO").

2. Through my position with SAFCO, I am fully aware of its internal workings and companies with whom it conducts business.

3. SAFCO is a distributor in business with resellers.

4. I am familiar with the type of chair involved in this litigation, described as a model 3480BL (hereinafter referred to as the "Chair").

5. The Chair was manufactured by defendant, Oasyschair, Co., LTD.

6. To the best of my knowledge it is my understanding that Oasyschair is a company operating out of Taiwan.

7.   Furthermore, it is my understanding that the Chair was manufactured in Taiwan at Oasyschair's facility.

8.   SAFCO did not design the Chair.

9.   SAFCO did not design nor provide any design drawings for the Chair.

10.   SAFCO did not manufacture the Chair.

11.   SAFCO had no significant control over the design of the Chair.

12.   SAFCO did not assemble the Chair.

13.   SAFCO did not package the Chair.

14.   The Chair arrived at SAFCO in a box from Taiwan, and the chair was not taken out of the box.

15. SAFCO did not perform any testing on the Chair.  Rather, all testing was performed by the manufacturer, Oasyschair.

16.   SAFCO was not aware of any alleged defects in the Chair.

17.   SAFCO did not create any defect in the Chair.

18. The specific chair at issue in this litigation was distributed, by SAFCO, to Staples.

19.   SAFCO neither altered nor changed the Chair in any way during its possession of same.

20.   I understand from the deposition of the plaintiff's expert, George P. Widas, P.E., which was taken on August 6, 2013, which I have reviewed, that Mr. Widas asserts that there were metal pins in plastic seats on the chair that were not properly inserted into the plastic seats at a proper depth.  He asserts that that was

a manufacturing defect that proximately caused the chair to fail. I understand that he did not assert that there was a design defect, but rather that, simply put, the pins should have been inserted deeper into the plastic seats.

21.    I know that that area of the chair (the pins in the seats) is completely enclosed and not subject to visual inspection at any time after manufacture.

22.    As noted previously, SAFCO had no control of any nature whatsoever regarding the manufacture of the chair, and did not manufacture the chair, nor did they place the metal pins into the plastic seats where the chair allegedly failed.

23.    I am aware that this Certification is being used to support the defendants' motion for Summary Judgment.

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Pam La Fontaine

Notary
Sworn and subscribed to before me on
this _28th_ day of _August_ 2013

Diane R O'Brien

DIANE R O'BRIEN
Notary Public
Minnesota
My Commission Expires Jan. 31, 2015

EXHIBIT

EXHIBIT C

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

WILLIAM GERACZYNSKI,
518 Prospect Place
Lyndhurst, NJ 07071,

       -- and --

CHRISTINE GERACZYNSKI
518 Prospect Place
Lyndhurst, NJ 07071,

         Plaintiffs,

       -- vs --

NATIONAL RAILROAD
PASSENGER CORPORATION AG,
d/b/a AMTRACK,

       -- and --

SAFCO PRODUCTS COMPANY
9300 West Research Center
Road New Hope, MN 55428,

       -- and --

LIBERTY DIVERSIFIED
INTERNATIONAL
5600 North Highway 169
New Hope, MN 55428-30976,

       -- and --

STAPLES, INC.
500 Staples Drive
Framingham, MA 01702,

       -- and --

CORPORATE EXPRESS
1 Environmental Way
Broomfield, CO 80021,

         Defendants,
- - - - - - - - - - - - - - - -

ORIGINAL

CIVIL ACTION
NO. 2:11-CV-06385-
SRC-MAC

DEPOSITION UPON
ORAL EXAMINATION
OF
GEORGE P. WIDAS
AUGUST 6, 2013

TAYLOR & FRIEDBERG, LLC
(973) 285-0411

Page 104

1      Z.

2           Q       And you involve yourself in matters

3      literally from A to Z?

4                   MR. ROSENTHAL:  Objection on form.

5           Q       Starting with automobiled and ending

6      with what?

7                   MR. ROSENTHAL:  Objection to form.

8           A       If you are asking me for a Z word,

9      that is your question?

10          Q       Have you been involved in a case

11     involving a Z word?

12          A       Not that I can recall off the top of

13     my head.

14          Q       But it's just about down to the Z?

15          A       That the subject of the incident in

16     which the same sciences are applied, over and over

17     and over again, changes, yes, the subject changes.

18          Q       And the subject literally an go from

19     almost A to Z that you have been involved in.

20     Correct?

21          A       Using the same sciences, yes.

22          Q       Now, can you point for me in any of

23     those photographs the location on the chair that you

24     believe somehow failed, because I want that picture

25     marked by the reporter and I want to put an X on the

Page 105

1    picture that shows the area where this chair

2    allegedly failed.

3          A      From this folder?

4                 MR. ROSENTHAL:  Objection to form.

5          Q      Yes, I think those are your pictures.

6    They are in my file, but I believe those are your

7    pictures.

8                 MR. ROSENTHAL:  Objection to form.

9          A      Do you want me to mark them all?

10         Q      No.  I just want you to show me one

11   picture that shows the area where this chair failed.

12   Just one picture, even though there might be other

13   pictures that show it in a different angle, pick out

14   for me if you can the clearest picture.

15         A      I have six photographs of different

16   categories that show the failure.  Scientifically

17   this one is the one I would pick if I had to only

18   pick one.

19         Q      Okay.  Give me the other five, please.

20   We will mark this one first with the label right

21   here okay.

22                (Color Photocopies of Photographs and

23                Report were received and marked D-17 through

24                D-22 for identification.)

25         Q      Sir, we have now marked various

1    photos, and let's go firstly to photo D-17 marked

2    today's date and you put this in front of me to show

3    me where the chair failed.  Correct?

4         A    Yes.

5         Q    Now, can you firstly point with your

6    finger to show me what in this picture is an indicia

7    of the chair somehow failing.

8              Can you take your pen and circle in

9    very dark so we know what we are talking about.

10        A    I can get a magic marker.

11        Q    In any event let's do it this way.  In

12   the center of the picture there appears to be an

13   oblique spheroid.  Do you know what that is?

14        A    Yes.

15        Q    The shape of the earth?

16        A    No.

17        Q    The earth is not an oblique spheroid?

18        A    Not that I know.

19        Q    Do you see this circle that seems to

20   be somewhat depressed in the middle of the

21   photograph?

22        A    Yes.

23        Q    In the middle of that there is a

24   circle which appears to be metal, is that where it

25   failed?

Page 107

```
 1                    MR. ROSENTHAL:  Objection to form.
 2          A      No.
 3          Q      That is not where it failed?
 4          A      No.  If you are pointing to the end of
 5     the metal bar, no.
 6          Q      There is an indicia in that picture
 7     chair failure, tell me what it is.
 8          A      I can color the surfaces if you like.
 9          Q      If that turns you on, go ahead.  Okay
10     in red the witness just put what he considered to be
11     an indicia of the materials that failed.  Am I
12     correct?
13          A      Yes.
14          Q      What's that material composed of that
15     failed?
16          A      Plastic.
17          Q      What kind of plastic?
18          A      They are thermoplastic polymer.
19          Q      What is the make of it?
20          A      I don't know exactly.  I believe we
21     have an indication in some of the material what it
22     was made out of.
23          Q      Who manufactured it?
24          A      I don't know specifically.
25          Q      What is the chemical make up of it?
```

1        A        I don't know specifically.

2        Q        And when you say that's an indicia of

3    failure, what failed, what is it that failed?

4        A        The part that is on the left, your

5    right side of the diagram with the marking in the

6    upper left, the part to the right side of the metal

7    bar is failed in tension elongation, stretching and

8    then ripped apart more or less is a good way to put

9    it, in the vernacular and then we have a brittle

10   ductal failure to the left of the bar that

11   progresses from hole in which the bar is inserted to

12   the left most edge of the oval that is the steel

13   tube frame member that supports the seat back.

14       Q        What do you call this round thing

15   here?  What do you call that?

16       A        A reinforcing pin.

17       Q        What is that made of?

18       A        Steel.

19       Q        What kind of steel?

20       A        Don't know specifically.

21       Q        Does steel come in grades?

22       A        Yes.

23       Q        Who manufactures the steel?

24       A        Don't know specifically.

25       Q        Have you ever seen another chair

Page 109

1    similar to this design by a competitor?

2          A     No.

3          Q     Have you ever seen engineering

4    drawings from a competitor regarding this type of

5    design?

6          A     No.

7          Q     You have never designed this type of

8    design in a chair, did you?

9          A     Not in a chair, no.

10         Q     Now is there another side -- strike

11   that.

12               Do any of these other pictures show

13   the area of failure?  This one here?

14         A     Yes.

15         Q     This would be D-20.  What in that

16   picture shows the area of failure?  Okay, you

17   circled something.  What do you call that that you

18   just circled?  What do you recall that?

19         A     The bottom of the seat back.

20         Q     What indicia is there in your view

21   that is a manifestation of some failure?

22         A     The mirror image of what we looked at

23   in the prior diagram where we have on the thin side

24   of the oval from the hole where the metal

25   reinforcing pin goes.  We have stretching of the

1    material and then we have brittle tensile failure

2    progressing from the hole to the bottom of the

3    photograph to the end of this cross section.

4         Q       If someone abused a chair and

5    subjected it to forces that it wasn't meant to be

6    subjected to, could that type of failure happen?

7         A       Yes.   This is overload failure.   It

8    would happened abruptly.   This is a brittle failure.

9    Other than the portion of the material that is

10   stretched, the very thin portion between the rod and

11   the nearest edge of the end of the oval.

12        Q       You are not a metallurgist are you?

13        A       Material science is part of civil

14   engineering, yes.   That is not my specialty, but I

15   am trained --

16        Q       Just answer the question.   Are you a

17   metallurgist, yes or no?

18        A       If by that you mean a person who only

19   does material science, no.

20        Q       Do you have a degree in metallurgy?

21        A       Not totally exclusively metallurgy.

22   It is certainly part of civil engineering.

23        Q       What type of degree does that person

24   get who is an expert in material?

25        A       Material science.

Page 113

1     A     Yes.

2     Q     Did you take photographs of the

3   different screws that you found in each chair?

4     A     Yes.

5     Q     And you have those photographs?

6     A     Yes.

7     Q     Now, you inspected this chair

8   yourself.  Correct?

9     A     Yes.

10    Q     Once or twice?

11    A     This chair being the subject chair

12   twice.

13    Q     When did you first inspect the subject

14   chair?

15    A     February 13, 2012.

16    Q     Who was present?

17    A     Mr. Rosenthal and some people from the

18   railroad.

19    Q     Who was there from the railroad?

20    A     I don't know.

21    Q     Was anyone there from the manufacturer

22   or distributor of the chair?

23    A     I don't know.  I don't think so.

24    Q     Did anybody take any videos of what

25   the inspection consisted of?

1        A        Not that I can recall.

2        Q        Was there something about the way this

3    chair was designed that you don't like?

4                 MR. ROSENTHAL:  Objection to the form.

5        A        Not design, no.  It is designed

6    properly.

7        Q        What about this chair did you find

8    detective or improper?

9        A        It wasn't manufactured according to

10   the design, which generated excessive stresses under

11   foreseeable loading less than it's design tolerance

12   and it failed readily as a loading considerably less

13   than its design tolerance.

14       Q        Can you tell a lay jury, pretend a lay

15   jury is here in front of you.  Can you tell them

16   what you are talking about?

17       A        The chair was designed to be strong

18   enough for somebody to sit in it and exert force to

19   the back of the chair.  This chair wasn't built

20   according to that design.  It was built very weak

21   and when somebody leaned against the back of it the

22   right way it broke.  It was at a very weak level.

23       Q        Is that the nature of your opinion

24   with respect to the chair?

25       A        Yes.

1   only failure, would that be of any consequence as

2   far as you are concerned?

3              MR. ROSENTHAL:  Objection.

4        A     No.  Well, the consequence would be we

5   would have to take a cross section of those chairs

6   and determine whether or not they were assembled

7   incorrectly the same way this chair was assemble

8   incorrect.

9        Q     Your allegation is that this chair was

10  assembled incorrectly?

11       A     Yes.  Manufactured, when I said

12  assembled I mean the reinforcing pin was not

13  inserted to a proper depth according to the original

14  design.

15       Q     So, your belief, if I could put this

16  in layman's terminology, had the pin been inserted

17  deep enough, according to the original design, that

18  would have rendered the chair not defective and okay

19  as far as you are concerned?

20       A     Yes.

21       Q     Do you know whether this chair had

22  been disassembled, maintained or examined by anyone

23  from the time it was delivered to the premises up

24  until the time of the accident?

25       A     There is no evidence that that

Page 121

1   happened and there was no evidence on the pins that

2   they were manipulated in anyway before we took the

3   chair apart and looked at them.

4        Q       The real bottom line here is that your

5   opinion is that one of the pins was not inserted

6   deep enough; is that correct?

7        A       No.  All of the pins we looked at were

8   not inserted deep enough.

9        Q       Why didn't the other chairs fail?

10       A       But they did not experience the same

11  loading.  They did not have 70 pounds pushed on the

12  back of the chair.

13       Q       I thought you had said 300 pound

14  people sat in this chair?

15       A       Correct.  That is down on the seat,

16  that is not against the back.

17       Q       A 300 pound person never leaned back

18  in a chair?

19       A       I'm sure they did.  That's is why it

20  is supposed to withstand 250 pounds.

21       Q       Why didn't the other chairs there

22  fail?  Why is this the only chair that failed?

23       A       Nobody leaned on the back the way that

24  Mr. Geraczynski did.

25       Q       Those chairs were all defective as far

Page 122

1    as you are concerned?

2         A    Absolutely.  Until we discovered that

3    we have chairs inserted to the proper depth.

4         Q    What is the proper depth of insertion?

5         A    At least .80 inches beyond the plane

6    of the end of the metal over X frame support.

7         Q    You found chairs that were -- strike

8    that.

9              You did find chairs that had the

10   proper amount of insertion?

11        A    No.

12        Q    You didn't see any chairs with that?

13        A    No.

14        Q    So, all of the chairs that you

15   examined, all of them were defective as far as you

16   were concerned?

17        A    Yes.

18        Q    Those didn't fail?

19        A    Correct.

20        Q    So, your beef, the bottom line beef is

21   that the pin was not inserted deep enough.  Correct?

22        A    Yes.

23        Q    Is that the bottom line?

24        A    Yes.

25        Q    How much deeper should it have been

Page 123

1    inserted to render the unit non-defective?

2         A    Point six zero inches.

3         Q    So, had it been inserted .60 inches to

4    the plane, it could have rendered it non-defective

5    as far as you are concerned?

6         A    Yes.

7         Q    Is that the only defect you found?

8         A    Yes.

9         Q    You have never seen this design

10   before.  Correct?

11        A    Not specifically, no.  I have seen

12   cantilever mechanisms before.

13        Q    You didn't conduct any tests with

14   respect to the chair to see what affect, if any, a

15   deeper insetting of the pin would produce in terms

16   of a response to the chair?

17        A    I didn't do a test.  I did a

18   calculation.

19        Q    Why didn't you do a test?

20        A    I didn't have any chairs at my

21   disposal.

22        Q    Did you ask for one?

23        A    No.

24        Q    Why not?

25        A    Didn't need to.  The calculations are

1    in addition.  Correct?

2            A        Correct.

3            Q        And this report is only predicated

4    upon information that has been supplied to you by

5    the plaintiff's attorney.  Correct?

6            A        Yes.

7            Q        I haven't done --

8            A        Well, and science and calculations and

9    diagrams, but other than that, no.

10           Q        You mentioned Gashinski and Otterbin

11   in your report.  Do you know them?

12           A        No.  Independently of this case, no.

13           Q        And Gashinski, do you know who he is

14   or what he does?

15           A        No.

16           Q        You don't know who Otterbin is and

17   what he does?

18           A        Correct.

19           Q        If we bring this down to its essence,

20   all you are saying in this case is that the male

21   part of this design was not far enough into the

22   female part, is that the bottom line?

23                    MR. ROSENTHAL:  Objection to form.

24           Q        Is it?

25           A        Referring to the reinforcing pin, yes.

E

X

H

I

B

I

T

E X H I B I T                     D









